**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NILOFER NANLAWALA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 21-cv-05624 |
| | ) | |
| v. | ) | Judge Jeffrey I. Cummings |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Nilofer Nanlawala brings this action against defendant City of Chicago alleging

that her employer, the Chicago Police Department, discriminated and retaliated against her based

on gender, national origin, race, and religion and subjected her to a hostile work environment in

violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.* ("Title VII").

Among other things, plaintiff argues that she requested certain accommodations during her

pregnancy in 2015, and when she returned to work after giving birth and needed to pump breast

milk, and that her accommodation requests impacted various staffing decisions made throughout

the following five years.  Defendant filed a motion for summary judgment, (Dckt. #89), arguing

that plaintiff's claims are time-barred and that plaintiff has otherwise failed to present sufficient

evidence of animus and has not suffered an adverse employment action.

For the reasons set forth below, the Court agrees that almost all of plaintiff's alleged

instances of discrimination and retaliation occurred outside the relevant statute of limitations,

and for the few instances that are not time-barred, there is no genuine dispute as to any material

fact and her claims fail as a matter of law.  Defendant's motion for summary judgment is

therefore granted, (Dckt. #89).

1

## I.  LEGAL STANDARD

Summary judgment is appropriate when the moving party shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  "A genuine dispute is present if a reasonable jury could return a verdict for the nonmoving party, and a fact is material if it might bear on the outcome of the case." *Wayland v. OSF Healthcare Sys.*, 94 F.4th 654, 657 (7th Cir. 2024); *FKFJ, Inc. v. Vill. of Worth*, 11 F.4th 574, 584 (7th Cir. 2021) (the existence of a factual dispute between the parties will not preclude summary judgment unless it is a genuine dispute as to a material fact); *Hottenroth v. Vill. of Slinger*, 388 F.3d 1015, 1027 (7th Cir. 2004) (issues of material fact are material if they are outcome determinative).

When the moving party has met that burden, the non-moving party cannot rely on mere conclusions and allegations to concoct factual issues. *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003).  Instead, it must "marshal and present the court with the evidence [it] contends will prove [its] case." *Goodman v. Nat. Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010).  In determining whether a genuine issue of material fact exists, all facts and reasonable inferences must be drawn in the light most favorable to the non-moving party. *King v. Hendricks Cty. Comm'rs*, 954 F.3d 981, 984 (7th Cir. 2020).  Ultimately, summary judgment is granted only if "no reasonable trier of fact could find in favor of the non-moving party." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 838 (7th Cir. 2012) (cleaned up).

## II.   FACTUAL RECORD

The following facts are undisputed unless otherwise noted.

### A.  Plaintiff's employment with CPD and her requests for pregnancy-related accommodations

Plaintiff Nilofer Nanlawala ("Nanlawala" or "plaintiff"), who is female, South Asian, Muslim, and has a Palestinian husband, first started working for the City of Chicago (the "City") on April 6, 2015 as a Probationary Police Officer.  (Dckt. #96 ¶¶1, 71, Plaintiff's Response to Defendant's Statement of Facts ("DSOF Resp.")).  She spent the first six months of her employment at the Chicago Police Department ("CPD") Training Academy (the "Academy"). (*Id.*).  Plaintiff became pregnant with her second child during her time at the CPD Training Academy, sometime after July 18, 2015.  (*Id.* ¶2).

On September 23, 2015, plaintiff submitted a "To/From report" requesting to be reassigned to "light duty status" because of her pregnancy and was assigned to work a desk position in the traffic unit for a few weeks before returning to foot patrol.  (*Id.* ¶2; Dckt. #105 ¶5, Defendant's Response to Plaintiff's Statement of Facts ("PSOF Resp."); *see also* Dckt. #92-1 at 25).  Once plaintiff returned to foot patrol, she submitted a reasonable accommodation form to request light duty work and the request was granted "shortly after."  (Dckt. #92-1 at 25). Plaintiff remained on light duty work assignment until she went on leave in April 2016.  (*Id.*; DSOF Resp. ¶3).

Plaintiff returned to work in November 2016 and was assigned to the Academy until December 2016.  (*Id.* ¶¶3–4).  During this time, CPD had a policy for accommodating nursing officers, E01-05, which was consistent with the Illinois Nursing Mothers in the Workplace Act, 820 ILCS 260 *et seq*. (the "Act").  (PSOF Resp. ¶¶11–12).  The CPD policy referred to the Act's definition of "private place," which provides that "[a]n employer shall make reasonable efforts to

3

provide a room or other location, in close proximity to the work area, other than a toilet stall, where an employee [] can express her milk in privacy." 820 ILCS 260/15; (*see also* PSOF Resp. ¶¶11–12). The only location offered to plaintiff to express breast milk during her time at the Academy was a bathroom and the personal office of a City attorney, who allowed plaintiff to use it when available, although the office did not lock from the inside. (DSOF Resp. ¶5).

Plaintiff left the Academy in February 2017 and was assigned to District 14. (*Id.*). At District 14, she was directed to pump breast milk in the bathroom or in the locker room and to use her two fifteen-minute breaks and her one thirty-minute break to pump. (*Id.* ¶8). According to plaintiff, two unnamed officers made fun of her for pumping breast milk while she was at District 14, but she never reported their statements to anyone. (*Id.* ¶7). Also, according to plaintiff, one of her supervisors at the time, Lieutenant Michael Patrick Fine, told a detective that plaintiff was not allowed to pump breast milk within the district. (*Id.* ¶9). According to Lt. Fine, he recalls one instance where plaintiff became upset because she needed an officer to replace her in the field in order for her to return to the station to pump. (*Id.* ¶¶9, 14; *see also* Dckt. #92-2 at 13–14).

Plaintiff achieved career status in Spring 2017 and became a police officer. (DSOF Resp. ¶11). Plaintiff finished pumping breast milk in November 2018. (*Id.* ¶10).

### B. Plaintiff is flagged for a medical home visit

On November 2, 2018, plaintiff reported that she had a non-injured on duty illness. (*Id.* ¶47). The next day, a home visit[1] was ordered based on plaintiff's medical status. (*Id.*). The

---

[1] Pursuant to CPD policy, home visits may be requested when an employee is off work with a non-duty related illness, and an employee may be disciplined if he or she is absent from home without permission or without notifying his or her unit. (DSOF Resp. ¶44). A Summary Punishment Action Request ("SPAR") may be initiated for any medical role violation that is brought to the attention of a lieutenant. (*Id.* ¶46).

officer assigned to conduct the home visit was unable to contact plaintiff and CPD initiated an "alternative disciplinary procedure for conduct also known as a SPAR." (*Id.* ¶¶46–48). Plaintiff ultimately was not disciplined in relation to the SPAR after a hearing took place and plaintiff informed CPD that they went to the wrong house. (*Id.* ¶49). Plaintiff's "SPAR History" reflects that no disciplinary action was ever taken, but plaintiff asserts that "despite not being disciplined *per se*, collateral repercussions persist" because the SPAR record remains in her file. (*Id.* ¶51; PSOF Resp. ¶29).

### C. Plaintiff's shift and partner assignments

CPD officers are assigned to one of three "watches," which divide a 24-hour day into three equal segments: the first watch (11:00 pm or midnight start); the second watch (7:00 am or 8:00 am start); and third watch (3:00 pm or 4:00 pm start). (DSOF Resp. ¶23). Officers are paid the same regardless of the watch they are assigned. (*Id.*). Eighty percent of watch assignments are determined via seniority. (*Id.* ¶24). The remaining 20% of positions are called "management" positions and are filled at the discretion of District Commander. (*Id.* ¶25). Positions obtained via management or via seniority are indistinguishable. (*Id.*). Each November, officers can rank the watches in order of preference for the following year and "bid" for their top choice. (*Id.* ¶22). Plaintiff ranked second watch as her top choice in November 2017, 2018, and 2019 (for the following years), (*id.* ¶¶33, 36, 39), but was selected for first watch all three years, (*id.* ¶¶33, 36, 42).

Looking at 2020, District 14 had ten management positions available for second watch and all ten went to employees previously assigned to the watch. (*Id.* ¶40). Officers who previously received a management position for a particular watch were not guaranteed to be reassigned to the same watch, but "unless there was an issue with an officer's police activity,

disciplinary issues, or the officer was no longer recommended for a management position by the Lieutenants on that watch," the officer would typically be retained.  (*Id.* ¶29).

Each watch has an early side and a late side—officers assigned to the early side of a particular watch will start and end sooner than officers assigned to the late side.  (*Id.* ¶12).  In 2017, the first watch's early side started at 9 pm and ended at 6 am, whereas the first watch's late side started at 10:30 pm and ended at 7:30 am.  (*Id.*).  Plaintiff "requested working the early side of the first watch close to 50 times."  (*Id.* ¶17).  She asked various lieutenants to be assigned to the early side before her weekly shift started and also made a standing request for the early side to accommodate her husband's shift and childcare.  (*Id.*).  According to CPD records, plaintiff worked the early side of first watch on all but seventeen days between April 23, 2017 and December 23, 2018, although plaintiff disputes the accuracy of the records.  (*Id.* ¶21).

Throughout her time at District 14, plaintiff made several requests to be paired with certain officers.  For example, plaintiff asked to be partnered with Officer Randall, Officer Perez, and Officer Cochran.  (*Id.* ¶19; Dckt. #92-1 at 43).  Lieutenants did not accommodate plaintiff's requests, saying "if they're able to, they would do it, if something becomes available."  (DSOF Resp. ¶19; Dckt. 92-1 at 43).  Plaintiff states that her requests to partner with Officer Cochran were disregarded until January 2, 2019 when an "open slot" became available in Officer Cochran's squad car and plaintiff was permanently partnered with Cochran until he left District 14.  (*Id.* ¶¶19–20).  While partnered, plaintiff was also assigned the early side of first watch and kept the early start time after Cochran left.  (*Id.*).  After Officer Cochran left, plaintiff requested to be partnered with Officer Ruiz and her request was granted.  (DSOF Resp. ¶19; Dckt. 92-1 at 43–44).

6

### D. Plaintiff's application for a tactical unit within CPD

While working in District 14, plaintiff applied to join a tactical team within CPD. CPD's tactical unit includes "sworn members assigned to different tactical, mission, and burglary teams." (DSOF Resp. ¶52). Tactical unit officers do not earn higher pay compared to other officers. (*Id.* ¶53). Plaintiff first submitted a "To/From report" on November 30, 2018 indicating that she wanted to join the tactical unit. (*Id.* ¶53). Plaintiff again applied on March 20, 2019. (*Id.* ¶56). In August 2019, officers were selected for the tactical unit and plaintiff was not one of the selected officers. (*Id.* ¶58).

### E. Plaintiff is transferred to District 17

After not getting the tactical unit assignment, plaintiff sought to be transferred to District 17. (*Id.* ¶¶67–68). According to plaintiff, it was well-known within District 14 that she is South Asian and Muslim, and at least three officers had observed plaintiff wearing a head scarf or praying. (PSOF Resp. ¶32). Plaintiff also asserts that coworkers knew her husband was Palestinian because she verbally told colleagues and supervisors and because this information appeared on her Facebook profile.[2] (*Id.*). A Muslim community leader wrote a letter to the District 17 Commander in support of her transfer request. (*Id.*). Plaintiff was eventually transferred to District 17 in early April 2020 and assigned first watch "due to operational needs." (DSOF Resp. ¶68). Wishing to work the second watch, however, plaintiff submitted a "hardship request" on April 30, 2020 asking to swap shifts due to childcare issues. (*Id.* ¶69). Her request was denied. (*Id.*). The District 17 Commander testified that another Commander, Commander

---

[2] The City disputes that plaintiff told her colleagues and supervisors about her husband being Palestinian, but plaintiff cites her own deposition testimony that she informed colleagues and supervisors about her husband's nationality and deposition testimony of two other officers where they testify that they were aware of plaintiff's husband's nationality. (Dckt. ##92-1 at 6; 98-4 at 37; 98-5 at 27).

Rangel, informed him that plaintiff "had issues showing up to work." (PSOF Resp. ¶32; *see also* Dckt. #92-11 at 28).

On April 26, 2020 plaintiff "sought counseling through CPD's Employee Assistance Program" for stress and took a leave of absence from work. (DSOF Resp. ¶70). Plaintiff has not returned to work since April 26, 2020. (*Id.*). On May 12, 2020, plaintiff's detail to District 17 was cancelled and she was returned to District 14 (although she remains on her leave of absence). (*Id.*). The District 17 Commander cancelled plaintiff's detail because "the timing of her medical leave 'seemed suspicious' when juxtaposed against her alleged past attendance issues per his conversation with [Commander Rangel]." (PSOF Resp. ¶30).

### F. Plaintiff files an EEOC charge

On August 31, 2020, plaintiff filed a Charge of Discrimination against CPD with the Equal Employment Opportunity Commission ("EEOC"). (DSOF Resp. ¶71). The entirety of plaintiff's charge reads as follows:

> I was hired by Respondent in or around 2015. My current position is Police Officer. Subsequent to my pregnancy and Respondent discovering that my husband is Palestinian, I have been denied promotional opportunities and desirable assignments. I have been disciplined. I believe I have been discriminated against because of national origin, race, sex, female, religion, Muslim, and in retaliation for engaging in protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended.

(*Id.*). The charge was cross-filed with the Illinois Department of Human Rights. (Dckt. #91-3 at 250).

### III. ANALYSIS

Plaintiff brings various Title VII claims for discrimination and retaliation, including one claim that she alleges is for a hostile work environment. Plaintiffs who file a Title VII claim are required to exhaust their administrative remedies: "(1) to afford the EEOC with an opportunity to

8

settle the matter and (2) to give the employer notice of the charges being levied against it." *Merja Ferizovic v. Hilton Hotels Rosemont, et al.*, No. 25 C 656, 2025 WL 2962627, at *3 (N.D.Ill. Oct. 20, 2025) (citing *Sitar v. Ind. Dept. of Transp.*, 344 F.3d 720, 726 (7th Cir. 2003)). At the outset, the City argues that plaintiff has failed to exhaust her administrative remedies related to her pregnancy and pumping accommodations because "[i]n order for a claim under Title VII to fall within the scope of an administrative charge, a plaintiff's complaint must, at minimum, describe the same conduct and implicate the same individuals." (Dckt. #90 at 14, *quoting Zigler v. Edward D. Jones & Co., L.P.*, 22cv4706, 2023 WL 3918966 (N.D.Ill. June 9, 2023)). In response, plaintiff states that she did administratively exhaust her claim because (1) she is alleging a hostile work environment, which "includes more than her request for an accommodation to express breast milk," and the continuing violation doctrine should apply; and (2) plaintiff concedes that her EEOC charge does not mention her request for accommodations, but "her EEOC charge would have reasonably been developed from the EEOC's investigation of her EEOC charge." (Dckt. #97 at 24). The Court addresses plaintiff's hostile work environment claim in Section III(A)(i)(1), *infra*. The Court notes, however, that, akin to *Ferizovic*, 2025 WL 2962627, at *3–4, plaintiff's EEOC charge is largely devoid of facts. Like *Ferizovic*, plaintiff does not include any names or specific acts that are linked to her claims of discrimination and retaliation, making it "difficult even to compare its factual nucleus to the specifics of [her] Complaint." *Id.* at *3.

In any event, because plaintiff filed her EEOC charge (cross-filed with the Illinois Department of Human Rights) on August 31, 2020, "only those acts that occurred [within] 300 days"—i.e. on November 5, 2019—or later are actionable. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002); *see also* 42 U.S.C. §2000e-5(e)(1).

9

### A. Plaintiff's Discrimination Claims

To begin, the Court must parse plaintiff's various theories of discrimination. She appears to bring a discrimination claim grounded in allegations dating back to her 2015 pregnancy and corresponding time pumping milk after she returned to work. In addition, plaintiff asserts discrimination theories that argue she was treated differently due to her status as a Muslim and South Asian, and due to her marriage to a Palestinian man. The City argues that summary judgment is warranted on plaintiff's discrimination claims because the majority of the alleged discriminatory events are time-barred, and that she otherwise fails to provide sufficient evidence to establish the elements of her discrimination claims. For the following reasons, the Court agrees.

### i. Most of plaintiff's discrimination claims are time-barred

As stated above, plaintiff's claims are actionable only to the extent that they arose on or after November 5, 2019. Plaintiff, however, asserts that her claims that arose prior to that date are timely under the continuing violation doctrine, which permits events that would otherwise be considered outside the time scope of a Title VII claim to be nonetheless considered. The Seventh Circuit recognizes three avenues for invoking the continuing violation doctrine: (1) where "an employer makes employment decisions over time that make it difficult for the employee to determine the actual date of discrimination;" (2) where the claim "involves an express discriminatory policy of the employer;" and (3) where the claim involves "discrete acts of discrimination [that] are part of an ongoing pattern and at least one of the discrete acts occurred within the relevant limitations period." *Platt v. Chicago Transit Auth.*, No. 18 CV 7219, 2019 WL 5393995, at *3 (N.D.Ill. Oct. 22, 2019), *quoting Tinner v. United Ins. Co. of Am.*, 308 F.3d 697, 708 (7th Cir. 2002). Plaintiff focuses on the second and third avenues and

argues that the continuing violation doctrine should apply because her allegations of discrimination are related to a City policy for breast pumping (under the second avenue) or otherwise constitute a hostile work environment where at least one instance of harassment occurred within 300 days of her August 31, 2020 EEOC charge (under the third avenue). (Dckt. #97 at 26–27). Plaintiff is wrong under both paths, and the Court begins with the latter.

### 1. Plaintiff does not offer sufficient evidence to sustain her hostile work environment claim and the continuing violation doctrine does not apply.

The Supreme Court delineated "discrete" retaliatory or discriminatory acts and "hostile work environment" claims in *Morgan*, 536 U.S. at 110–13. A discrete act is one that "occurred" on the day that it "happened," thus triggering the clock to file an EEOC charge. *Id.* at 110. Each discrete act "starts a new clock for filing charges alleging that act." *Id.* at 113.

For a hostile work environment claim, on the other hand, plaintiff must present evidence that (1) she was subject to unwelcome harassment; (2) the harassment was based on a reason forbidden by Title VII; (3) the harassment was so severe or pervasive that it altered her conditions of employment and created a hostile or abusive working environment; and (4) there is a basis for employer liability. *Smith v. Ill. Dept. of Transp.*, 936 F.3d 554, 560 (7th Cir. 2019). The "very nature" of hostile environment claims involve repeated conduct that collectively "constitute[s] one unlawful employment practice." *Morgan*, 536 U.S at 115–17. It therefore does not matter if some conduct falls outside the 300-day period; so long as *one act* contributing to the claim occurs within the filing period, the entire time period of the hostile work environment may be considered. *Id.* at 117.

Unfortunately, here, plaintiff fails to specify the evidence that constitutes her hostile work environment claim. Liberally construed, plaintiff claims that her requests for pregnancy and breast pumping accommodations made her supervisors unhappy and gave her a reputation as

11

someone who "abuses leave." (Dckt. #97 at 28). Next, plaintiff claims she was "denied breaks to pump, denied partner requests, denied requests to be assigned to a different watch or an earlier side of her shift, denied management bids for her preferred watch, and denied assignments to tactical and robbery, which would have helped her career record of accomplishments. When she tried to transfer out of District 14 to District 17, these issues followed her until she was transferred back to District 14." (*Id.*). According to plaintiff, "[t]his conduct stemmed from her pregnancy and breast pumping accommodations, which are directly tied to Plaintiff's gender." (*Id.*).

Plaintiff's attempt to invoke a hostile work environment claim based on this evidence falls short. While her complaints about her pregnancy and breast pumping relate to her gender, she fails to provide any connection between these issues (which occurred far outside the 300-day filing window) and the other allegations of harassment. Again, the conduct comprising a hostile work environment must "collectively constitute one 'unlawful employment practice.'" *Morgan*, 536 U.S at 115. Plaintiff does not connect the alleged discriminatory actions sufficiently (or at all) to her gender so that they can collectively be considered one "practice." Consequently, plaintiff fails to satisfy the requirements for a hostile work environment claim.[3]

Moreover, according to the Supreme Court, "termination, failure to promote, denial of transfer, or refusal to hire," are all examples of discrete acts. *Morgan*, 536 U.S. at 114; *see also Otero v. City of Chicago*, No. 10 CV 2284, 2013 WL 530977, at *6 (N.D.Ill. Feb. 6, 2013) (denial of promotion is also a discrete act). Therefore, each time one of the alleged

---

[3] Plaintiff argues that because she survived a motion to dismiss, the law of the case doctrine provides that all of plaintiff's claims are timely. (Dckt. #97 at 26–27). Not so. "All the complaint need do is state a grievance. Details and proofs come later," and the "time to demand evidence is the summary-judgment stage." *Thomas v. JBS Green Bay, Inc.*, 120 F.4th 1335, 1338 (7th Cir. 2024). Thus, the fact that a claim has survived a motion to dismiss does not mean that the claim will survive summary judgment.

discriminatory events happened, "a new clock for filing charges" began. *Id.* at 113. "This rule applies even if an old, unchallenged discriminatory act has a present effect on an employee's status in a seniority system, a progressive discipline system, or some other dynamic employment scheme." *Barrett v. Ill. Dep't of Corr.*, 803 F.3d 893, 898 (7th Cir. 2015). So, while plaintiff argues that the effects of alleged discrimination "followed her until she was transferred back to District 14," (Dckt. #97 at 28), "[a] discriminatory act which is not made the basis for a timely charge . . . is merely an unfortunate event in history which has no present *legal* consequences." *Barrett*, 803 F.3d at 898, *quoting United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977). In other words, the "'*consequences* of the [discriminatory discrete] act,' that may materialize down the road," do not make an otherwise time-barred claim timely. *Barrett*, 803 F.3d at 898, *quoting Del. State Coll. v. Ricks*, 449 U.S. 250, 258 (1980).

The Seventh Circuit's decision in *Koelsch v. Beltone Elecs. Corp.*, 46 F.3d 705 (7th Cir. 1995), is on point. There, the Court rejected the plaintiff's attempt to bring a hostile work environment claim under the continuing violation doctrine for two reasons: "[f]irst, to assert a successful continuing violation claim, the facts alleged to have occurred within the three-hundred-day period must be 'related closely enough' to the prior acts such that they are to be considered one ongoing violation. In other words, there must be a sufficient nexus." *Id.* at 707 (cleaned up). Second, "[i]solated and innocuous incidents do not support a finding of sexual harassment." *Id.* at 708.

Again, here, plaintiff does not provide any nexus between the alleged discrimination related to her pregnancy and breast feeding and any other alleged discrimination (beyond the bare assertion that the conduct "stemmed from her pregnancy and breast pumping accommodations."). (Dckt. #97 at 28). Plaintiff merely describes a series of employment

13

decisions with which she did not agree, but this is insufficient to invoke the continuing violation doctrine and escape the 300-day filing limitation. *See Kuhn v. United Airlines, Inc.*, 640 Fed.Appx. 534, 537 n.1 (7th Cir. 2016) ("Kuhn previously had the opportunity to sue for discrimination or hostile work environment based on the events preceding her 2007 EEOC charge, she chose not to do so within the time allowed."); *Garrison v. Burke,* 165 F.3d 565, 570 (7th Cir. 1999) (continuing violation doctrine does not apply to discrete, isolated, and completed acts of discrimination).

## 2. Any discriminatory acts related to the City's policy on pregnancy accommodations and pumping are time-barred and the continuing violation doctrine is inapplicable.

To recap, plaintiff finished pumping breast milk in November 2018 but did not file her EEOC charge until August 31, 2020, well beyond the 300-day charge filing period. But plaintiff attempts to further invoke the continuing violation doctrine by showing a "systematic policy or practice of discrimination that operated, in part, within the limitations period—a systemic violation." *Morgan*, 536 U.S. at 107 (cleaned up). Specifically, plaintiff points to the City's "policy guaranteeing accommodations for pregnant and nursing police officers." (Dckt. #97 at 22). According to plaintiff, she "requested light duty to accommodate her pregnancy" in September 2015 and the request was granted in January 2016. (*Id.* at 22–23). Once plaintiff returned to work after giving birth, however, she "was not granted reasonable accommodations to express breast milk," and instead was instructed to "express breast milk in non-private facilities like a locker room, or an unclean bathroom," (*id.* at 23).

While the Court acknowledges that plaintiff's reports of mistreatment are troubling, she nonetheless fails to invoke the continuing violation doctrine based on the City's policy. As explained above, the continuing violation doctrine can apply "where the plaintiff alleges that the

14

defendant has acted pursuant to an express discriminatory policy," *Rouse v. Chicago Transit Auth.*, No. 13-cv-5260, 2016 WL 5233591, at *11 (N.D.Ill. March 19, 2018), but that is not what plaintiff is alleging here. Instead, plaintiff argues that the City failed to comply with its policies and with relevant law, and not that its policies were expressly discriminatory. *See id.* (collecting cases discussing the applicability of the continuing violation doctrine where plaintiff alleges an express discriminatory policy); *Dooley v. Abbott Labs*, No. 7 CV 7249, 2009 WL 1033600, at *7 (N.D.Ill. Apr. 17, 2009) (doctrine inapplicable where the plaintiff "ha[d] not produced any evidence of an express discriminatory policy."). Here, plaintiff is not alleging that the policy is facially discriminatory.

Plaintiff's allegations related to her pregnancy and breast pumping therefore constitute failure to accommodate claims. But a failure to accommodate claim is "'a discrete act—not an ongoing omission—and therefore the continuing violation doctrine does not apply.'" *Robinson v. Off. of the Cook Cnty. Recorder of Deeds*, No. 20cv2023, 2021 WL 1165100, at *13 (N.D.Ill. March 26, 2021), *quoting Teague v. Northwestern Mem'l Hosp.*, 492 F.Appx. 680, 684 (7th Cir. 2012). The fact that plaintiff uses the term "policy" in her briefing does not toll the statute of limitations. *See, e.g.*, *Morgan*, 536 U.S. at 111 ("There is simply no indication that the term 'practice' converts related discrete acts into a single unlawful practice for the purposes of timely filing.").

### 3. Plaintiff's remaining allegations of discrimination before November 5, 2019 are time-barred.

Satisfied that plaintiff's claims related to her pregnancy and breast pumping fall outside the 300-day filing requirement for Title VII claims, the Court next turns to plaintiff's remaining discrimination theories, which all concern disparate treatment: that she was discriminated against on account of her race (South Asian); her husband's national origin (Palestinian); and her

15

religion (Muslim). However, as with her pregnancy and breast pumping related claims, many of the alleged discriminatory acts took place outside the 300-day time period for plaintiff's Title VII claim, which, again, looks at events occurring between November 5, 2019 and August 31, 2020. Any claims related to the following events are thus time-barred: (1) claims related to plaintiff's partner requests being denied, which occurred, at latest, in January 2019, (DSOF Resp. ¶19–20); (2) claims related to plaintiff's requests for assignment to the earlier side of a shift, which occurred, at latest, in January 2019, (*id.* ¶¶19–20); and (3) claims related to plaintiff's application to the tactical unit, which took place in November 2018 and the Spring and Summer of 2019, (*id.* ¶¶53, 56–58).

In sum: all alleged events of discrimination are time-barred to the extent that they arose before November 5, 2019.

### ii. Plaintiff's remaining timely allegations of discrimination fail as a matter of law.

Plaintiff's remaining alleged discriminatory acts (that are not time-barred) relate to her claim that she was selected for first watch, instead of the second watch, every year, including 2020, which *was* within the relevant time period for her Title VII claim. In order to survive summary judgment on her disparate treatment theories of discrimination related to this conduct, plaintiff must show that the evidence "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Igasaki v. Ill. Dep't of Fin. & Prof'l Regul.*, 988 F.3d 948, 958 (7th Cir. 2021).[4] The standard considers the totality of the evidence. *Ortiz*, 834 F.3d at 763–64.

---

[4] Plaintiff incorrectly cites "indirect" and "direct" methods of proof for discrimination, (Dckt. #97 at 21–22), but this is not the law in this Circuit. *See Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 763–65 (7th Cir. 2016). In *Ortiz*, the Seventh Circuit explicitly rejected the use of any such "indirect" and "direct" methods of proof. *Id.* at 763–64 ("The district court's effort to shoehorn all evidence into two 'methods,' and its insistence that either method be implemented by looking for a 'convincing mosaic,' detracted attention from the sole question that matters: Whether a reasonable juror could conclude that

Crucial to a Title VII claim, however, is the requirement that plaintiff suffered an adverse employment action. *Robinson v. Austin*, 602 F.Supp.3d 825, 832 (D.Md. 2022) ("Essential to any discrimination claim is that the plaintiff suffered a legally sufficient adverse employment action."). The Supreme Court recently clarified what constitutes an adverse employment action in *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346 (2024). In *Muldrow*, the Supreme Court explained that an adverse action in the discrimination context must cause "some injury in employment terms or conditions," but need not cause "significant" employment disadvantage. *Id.* at 356.

While *Muldrow* lowered the standard for what constitutes an adverse employment action for a discrimination claim, on the instant record, plaintiff is grasping to even meet that standard. Again, in support of her claim, plaintiff points to evidence that she was selected for first watch every year. Indeed, looking at the relevant time frame, plaintiff's first choice for the 2020 bid was for the second watch, but she was selected for the first watch. (*Id.* ¶¶39, 42). Plaintiff also submitted a hardship request while she was at District 17 in 2020 because she wanted to be reassigned to the second watch due to childcare reasons. (*Id.* ¶69). Her hardship request was denied and District 17's Commander did not meet with her to discuss the denial. (*Id.*).

Again, an adverse action must cause "some injury in employment terms or conditions," *Muldrow*, 601 U.S. at 356. Here, plaintiff has not attempted to argue or present any evidence that her assignment to the first shift (instead of the second) adversely affected her pay or duties, or that the first shift was inherently more dangerous than the second. And, generally speaking "[a] change in shift assignments will not normally be sufficient to qualify as an adverse employment action, unless it is accompanied by some other detriment." *Ellis v. CCA of Tenn.*

---

Ortiz would have kept his job if he had a different ethnicity, and everything else had remained the same.").

*LLC*, 650 F.3d 640, 650 (7th Cir. 2011); *see also Brody v. Costco Wholesale Corp.*, No. 23-CV-293-JDP, 2025 WL 278318, at *6 (W.D.Wis. Jan. 23, 2025) ("Because Brody has offered no evidence that there is a material difference between the night shift forklift driver position he was offered and the day shift position that he contends Costco should have offered him, no reasonable jury could conclude that Brody suffered an adverse employment action.").

On the other hand, however, it is undisputed that plaintiff requested the second shift for childcare purposes, and the City, at a minimum, concedes that it can take family considerations into account when filling the discretionary so-called "management" positions for a specific watch (as opposed to the seniority positions). (*See* DSOF ¶30 ("Cmdr. Saldana did review and consider hardship requests.") & PSOF Resp. at 18 (acknowledging certain testimony, albeit vague, that officers have asked for and likely been assigned certain shifts based on hardship requests related to family reasons)). Thus, in view of the City's concession that it can consider family circumstances when assigning shifts, plaintiff has shown her denial of her preferred shift can amount to an adverse action under the lower standard of *Muldrow*. *See Thomas*, 120 F.4th at 1337 ("*[I]f the employer considers family circumstances when assigning shifts*, it must do so without regard to color, because inability to care for a child is a deeply felt loss for all parents" and thus entails "some harm" under *Muldrow*) (emphasis added); *Galvan v. City of Chicago*, No. 24 CV 3854, 2025 WL 1807984, at *6 (N.D.Ill. July 1, 2025) ("Galvan alleges that the shift change makes her job more dangerous *and makes it more difficult to see her young child.* This is sufficient to establish an adverse action under *Muldrow*.").

Nonetheless, even if plaintiff did suffer an adverse employment action when the City denied her second shift request in 2020, she has failed to present sufficient evidence to connect the denial of her preferred shift to any protected characteristic. Indeed, the only evidence

18

plaintiff points to is a conversation between the District 14 and District 17 commanders that mentioned plaintiff having "attendance issues," (PSOF Resp. ¶31), and the fact that the District 17 commander denied plaintiff's request to further discuss her hardship request. (DSOF Resp. ¶69). Neither piece of evidence has anything to do with plaintiff belonging to a protected class and thus no reasonable fact finder could conclude that plaintiff's race, ethnicity, sex, religion, or other prescribed factor caused the adverse action. *Igasaki*, 988 F.3d at 958.

Moreover, with respect to shift assignments generally, plaintiff agrees that "the decision of which watch to assign a police officer [to] is "discretionary" and that availability plays a role. (Dckt. #97 at 10; *see also id.* at 36 (stating further that "others testified that a police officer normally gets the partner they request, and *if there is availability for a different side of the shift or Watch* because of family responsibilities, these requests are typically granted.")). With respect to shift assignments in 2020, it is undisputed that plaintiff had not accrued enough seniority in District 14 to *bid* into a second watch position, and of the ten management positions available for second watch, all ten went to employees previously assigned to the watch. The evidence also shows that Commander Pontecore, who considered and denied plaintiff's request for the second shift at District 17, "desperately needed people" on the First Watch as it was "decimated," (DSOF ¶69); that that he never approved hardship requests "because it would start a domino effect;" and that, at least in District 17, an officer "needed almost 20 years to get on days on a bid, let alone trying to get on management." (Dckt. #92-11 at 35). On this record, no reasonable juror could find that plaintiff's protected status, as opposed to one or more of these other factors, played a role in her shift assignment.

Furthermore, plaintiff has failed to properly point to any similarly situated individuals who were granted a preferred shift in 2020 (as opposed to those granted a preferred partner or

19

beat, which she does at least attempt to articulate, (Dckt. #97 at 30)) based on a hardship request for family reasons. Instead, she states only, without much elaboration as to the relevant time frame, that "[o]fficers seeking and receiving management positions because of hardship and/or family reasons happens many times." (DSOF Resp. ¶26). This vague assertion is insufficient to create a genuine issue of material fact as to whether "similarly situated employees who were not members of her protected class were treated more favorably." *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 719 (7th Cir. 2018).

In sum: even assuming plaintiff suffered an adverse employment action when she was denied the second shift in 2020, she has failed to present sufficient evidence from which a reasonable fact finder could conclude that her, race, ethnicity, sex, religion, or other prescribed factor caused the adverse action, as opposed to other non-discriminatory factors such as seniority, availability, and the needs of the department. *Igasaki*, 988 F.3d at 958; *see also Patel v. DeJoy*, No. 23-1344, 2024 WL 837906, at *3 (7th Cir. Feb. 28, 2024) ("[W]ithout evidence that would allow a reasonable jury to infer that a protected characteristic of hers caused the [employer] to take any action here, summary judgment was warranted.").

### B. Plaintiff's Retaliation Claim

Title VII also "prohibits an employer from retaliating against an employee because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." *Est. of Harris v. City of Milwaukee*, 141 F.4th 858, 869 (7th Cir. 2025) (cleaned up). For retaliation claims, "the harm threshold is higher than that of direct discrimination claims." *Id.* While *Muldrow* lowered the harm threshold for discrimination claims to require only "some harm," retaliation claims require harm to be materially adverse, "meaning that it causes 'significant' harm." *Id.*, quoting *Muldrow*, 601 U.S. at 350, 357–58.

20

As plaintiff explains in her response brief, her retaliation claim is premised on (1) requesting a "light duty accommodation" for her pregnancy; and (2) requesting breast pumping accommodations. (Dckt. #97 at 34). As discussed above, *supra* Section III(A)(i), both of these requests took place outside of the 300-day period. Plaintiff's allegations about retaliation include that her "superiors unfairly targeted her, [and] falsely assert[ed] she had abused medical leave, although there is no proof of official or unofficial reprimand to substantiate their allegation that she abused medical leave." (*Id.*). According to plaintiff, "this was connected to [her] request for light duty pregnancy accommodation and to have a clean private space to express breast milk." (*Id.*).

In support, plaintiff points to the same alleged actions from her discrimination claim with a few additions: that she was "flagged by Lt. Block for a home visit" during one of her medical leaves, and that her detail to District 17 was cancelled. (Dckt. #97 at 36 (citing DSOF Resp. ¶43 and PSOF Resp. ¶69)). However, the "home visit" occurred on November 2, 2018, and is thus time-barred. (DSOF Resp. ¶47). Regarding the cancellation of her detail to District 17, plaintiff does not explain how this constitutes an adverse employment action. Nonetheless, the Court is not persuaded that plaintiff could present any argument that the detail cancellation is an adverse employment action because it occurred *after* plaintiff went on a leave of absence from work and she has not returned since. (DSOF Resp. ¶70; PSOF Resp. ¶30). Plaintiff therefore cannot point to any injury she experienced from the detail cancellation. Because plaintiff fails to point to any adverse action within the 300-day filing period, plaintiff's retaliation claim fails.

## CONCLUSION

For all of these reasons, defendant's motion for summary judgment, (Dckt. #89), is granted.


**Date: March 31, 2026**

**Jeffrey I. Cummings**
**United States District Court Judge**